2024 IL App (1st) 230893

THIRD DIVISION
August 28, 2024

No. 1-23-0893

| | |
|---|---|
| BETH SVEC, | ) Appeal from the |
| | ) Circuit Court of |
| Plaintiff-Appellee, | ) Cook County |
| | ) |
| v. | ) No. 20 L 010535 |
| | ) |
| THE CITY OF CHICAGO, | ) Honorable |
| | ) Daniel J. Kubasiak, |
| Defendant-Appellant. | ) Judge, Presiding |

JUSTICE D.B. WALKER delivered the judgment of the court, with opinion.
Justice Lampkin concurred with the judgment and opinion.
Presiding Justice Reyes concurred in part and dissented in part, with opinion.

## OPINION

¶ 1   Defendant City of Chicago (City) appeals the judgment of the circuit court, after a jury trial, finding for plaintiff Beth Svec on her claim under the Whistleblower Act (740 ILCS 174/1 *et seq.* (West 2020)). On appeal, the City contends (1) the trial court should have granted its motion for judgment notwithstanding the verdict (JNOV) where plaintiff did not suffer a materially adverse action, (2) alternatively, a new trial is warranted where the trial court failed to instruct the jury on the proper definition of retaliation under the Whistleblower Act, and (3) the damages award should be vacated or a remittitur ordered where the $3 million emotional distress award shocks the judicial conscience and lacks support in the record. For the following reasons, we affirm as modified.

¶ 2                          I. BACKGROUND

¶ 3      On October 2, 2020, plaintiff filed a claim against the City for retaliation in violation of sections 15(b) and 20 of the Whistleblower Act. She alleged that the City violated the Whistleblower Act by retaliating against her for disclosing information to a government or law enforcement agency and for refusing to participate in activities that would violate the law and Chicago Police Department rules. See *id.* §§ 15(b), 20. She requested a judgment granting her back pay, front pay, and compensation for lost benefits, as well as damages for past and future emotional distress and the costs of reasonable medical expenses. She also sought reasonable attorney fees and costs and "all other relief that is just and equitable."

¶ 4      The case proceeded to trial on July 12, 2022. In his opening statement, plaintiff's attorney suggested that the jury "could make an example with your verdict in this case," to which defense counsel objected. The trial court sustained the objection.

¶ 5                          A. *Trial*

¶ 6                       1. Plaintiff's Testimony

¶ 7      Plaintiff testified that she became a police officer in 1998 and always had an interest in law enforcement. Her father, brother, and cousin were police officers, and she had many friends who were police officers. Her "ultimate goal" was to become a detective, which she attained in December of 2005. She was proud of her work as a detective, and in the year before the whistleblower incident, she received an evaluation of "exceeds expectations" in every category. In her 10 years as a detective, management assigned her to the day or afternoon shift.

¶ 8      In July 2015, plaintiff was selected to participate in a new program designed to improve police investigations into gun charges. In the program, a detective, rather than the arresting officer,

would investigate and present gun charges to the state's attorney's office. Plaintiff was the first detective selected to implement this program.

¶ 9    On May 30, 2016, plaintiff investigated an arrest made that morning by Officers Brandon Ternand and Robert Caulfield. She had worked with them on other cases and never had an issue before. The officers informed plaintiff that they were driving along Stewart Avenue when they observed three men sitting on a front porch. Officer Ternand noticed that one of the men, Cemone Lewis, was sitting on top of a firearm. The officers approached the porch and immediately took Lewis into custody. They also recovered the weapon.

¶ 10    After Lewis was taken into custody, another man, Theric Patrick, stood and said something to the effect of, "I'm going to beat your a** if you go up [onto the porch]." When Officer Ternand tried to arrest him, Patrick punched him in the head. Lewis was arrested for unlawful use of a weapon, and Patrick was arrested for aggravated battery of a police officer and resisting arrest.

¶ 11    Plaintiff testified that although she observed an abrasion on Officer Ternand's head, the wound looked "like something rubbing versus punching." Plaintiff subsequently interviewed both officers together, and they told her that they did not unholster their firearms when they approached the men on the porch. Plaintiff viewed this as "a huge red flag" due to the obvious hazard of approaching an armed person in an unprotected state. In her investigation, plaintiff also visited the site of the arrests. She became "concerned about the visibility of the gun being seen from street level in [the officers'] car." Although she did not believe the officers were lying at the time, "[t]hings were very *** 'hokey.' "

¶ 12    Plaintiff then interviewed the arrestees who had been placed in separate cells. She spoke with Lewis first. He told her that he, Patrick, and Joseph Felton were on Felton's porch when a police vehicle stopped in front of the house. The officers approached and asked what they were

doing on the porch. The officers said they were "looking for someone, chasing somebody." Lewis denied that he was sitting on a barstool. Felton pointed to where his firearm was located on the porch and an officer recovered the weapon and removed the magazine.

¶ 13    The officers asked the men their names, but they would not answer. The men wanted to know why the officers were on the porch. Officer Ternand became upset and "slapped an iPad" from Patrick's hand because Patrick was not answering him. Officer Ternand then grabbed Patrick and pulled him to the ground. Other officers came to assist. Lewis pulled out his phone and began to record the incident. Lewis and Patrick were subsequently arrested. Lewis denied that he was in possession of a firearm. Plaintiff later viewed the recording on Lewis's phone, which showed officers wrestling Patrick to the ground.

¶ 14    When plaintiff interviewed Patrick separately, he told a version of the incident that was identical to Lewis's version. Plaintiff became "nervous" because Lewis and Patrick were never together after their arrest "to concoct a story." Yet they were telling plaintiff the same story, which also contradicted the version of events told by the arresting officers.

¶ 15    Plaintiff returned to the scene to interview Felton and other witnesses. Felton's version of the incident was the same as that told by Lewis and Patrick. Felton stated that he had legally purchased the firearm and Lewis was not sitting on it when the officers approached them. Plaintiff later viewed a copy of the receipt showing Felton's purchase. Felton stated that Officer Caulfield had approached him in the past and knew that he owned a legal firearm.

¶ 16    While plaintiff was at the scene, a woman approached her with a cell phone video of the incident. She allowed plaintiff to watch the recording. It showed that officers did not recover a firearm from under Lewis on the barstool. Instead, Lewis was sitting as officers spoke with Felton and Patrick. Plaintiff then observed Officer Ternand slap something out of Patrick's hand before

grabbing Patrick and pulling him to the ground. Plaintiff did not see Patrick punch Ternand. Lewis was not handcuffed as Patrick was pulled to the ground.

¶ 17    Plaintiff asked the woman if she could have a copy of the video, but the woman refused. She also refused to provide a name or contact information. Plaintiff described the woman as "toned," between 20 to 25 years old, with dark skin and wearing a "royal blue capped shirt." She also wore thick black sunglasses and had shoulder-length hair.

¶ 18    Plaintiff testified that "everything [in the video] was inconsistent." As she watched the video, she "kept thinking [ ] how screwed up this was and how [her] career [was] over" because she had to confront the officers with their lies regarding the incident. Telling the truth would "hurt" her because she was not "protecting the officers." However, she believed the officers' actions were "illegal."

¶ 19    When plaintiff returned to the police station, she encountered Officers Caulfield and Ternand. She told them she had viewed a video that completely contradicted what they had told her about the incident. She then went to her supervisor's office to report her findings. Lieutenant Adnardo Gutierrez and Sergeant Dawn Love, the supervisors of Officer Caulfield and Officer Ternand, soon entered to join the meeting. Plaintiff reported her findings, and Lieutenant Gutierrez suggested that she was lying because she could not obtain a copy of the video. He told plaintiff to report the arrests to the state's attorney to seek felony charges against Lewis and Patrick.

¶ 20    Plaintiff informed the state's attorney office of her findings, including what was depicted on the video recording. Assistant State's Attorney David Potter ultimately rejected the charges against Lewis and Patrick, and the men were released without charges. Lieutenant Gutierrez was upset when he heard of the rejection.

¶ 21    Plaintiff also attempted to report her findings to her supervisor, Lieutenant Edward Wodnicki. Lieutenant Wodnicki, however, refused to listen. He said that he had spoken with Lieutenant Gutierrez, as well as with Officer Ternand's and Officer Caulfield's tactical team, and they no longer wanted to work with plaintiff. Lieutenant Wodnicki stated that he was removing her from the special program and from the Area South Detective Division. Plaintiff began to cry and begged him not to remove her from the position. Lieutenant Wodnicki refused, but asked her "where do you want to go?" Although plaintiff insisted on staying, she was told that she "ha[d] to leave the Area." Plaintiff agreed to go to the Seventh District and was reassigned to that location to investigate property crimes.

¶ 22    Plaintiff testified that Area South was a more desirable assignment because the supervisors were also at that location. She stated that her workspace at the Seventh District was a small room with no opportunity to collaborate with other detectives on investigations, unlike the conditions at Area South. When plaintiff reported to the Seventh District, no one wanted to work with her.

¶ 23    Shortly after her reassignment, plaintiff was moved to the midnight shift. She testified that officers are assigned shifts based on a yearly bidding process. Although 80% of the shifts are filled based on seniority, management has discretion to fill the remaining 20%. Plaintiff testified that since 2006, management utilized its discretion to assign her to a day or afternoon shift because she did not have the seniority to get those shifts through the bidding process. She stated that officers preferred the third watch and that working "days" was "always preferred." Plaintiff testified that officers assigned to the midnight shift were "getting dumped," meaning that the officer's supervisors or management wanted "to set an example."

¶ 24    In November 2016, plaintiff completed her shift assignment bid for 2017. She selected second watch, or day shifts, for her first choice and "no bid" as her second choice. Plaintiff testified

that by choosing "no bid," she was indicating that she wanted management to exercise its discretion to keep her on second watch. For her third choice, plaintiff selected third watch, or afternoons. Her last choice was first watch, or the midnight shift. Plaintiff was assigned the midnight shift. On December 6, 2016, plaintiff sent a letter requesting to remain on second watch. In the letter, she explained that she had been assigned to the first watch, due to her "own error completing her Watch Bid for 2017 allowing [plaintiff to be assigned] on any Watch at the discretion of the Unit."

¶ 25    On December 11, 2016, plaintiff fell at home after shoveling snow and was placed on medical leave. She had "cracked" her rear end and the back of her head, and she injured her lower back. Her treating physician excused her from work until April 1, 2017. As she discussed returning to work with her doctor, she realized that she feared returning to work. After her transfer, she felt alienated from other detectives and felt constant shame, "like [she] did something wrong." Furthermore, "being put on midnights *** that was one of the worst things that they could have done." Plaintiff was "spiraling" and not sleeping. She was referred to Sheila Baxter, a mental health counselor.

¶ 26    In February 2017, Baxter did not release plaintiff for work. In March or April 2017, however, plaintiff "begged" to return to work. After she was released for work, plaintiff returned to the midnight shift. Her supervisor informed her that, shortly after hearing plaintiff had filed a suit against the City, he received an order from headquarters to obtain her urine sample. Plaintiff was worried that someone might try to contaminate her sample. On her first or second day back, another detective told her that "everybody's p**sed at you." Another called her a "whistleblower." A week later, she learned that Lieutenant Wodnicki said she was "crazy" in front of 100 new detectives. Plaintiff also received a lower performance rating for 2016, the year of the incident.

¶ 27    Plaintiff testified that she began smoking again, after having quit the habit, because it was "a stress reliever." Plaintiff could not sleep for days, and she gained weight from binge eating. She withdrew from relationships and felt fear, anxiety, and embarrassment. As a result, she returned to medical leave and began treatment with a psychiatrist, Dr. Nitin Thapar, in July 2017. Dr. Thapar diagnosed plaintiff with major depression and anxiety and prescribed Zoloft and Trazodone.

¶ 28    During this time, although she was not released for work, plaintiff requested an assignment to robberies and second watch upon her return. She received no response to her requests. In August 2017, plaintiff was offered second watch in the special victims' unit because the department needed officers in that area. Plaintiff declined the offer because she wanted to investigate robberies. She had "been in" robberies for the majority of her career. She believed that they should "put the new detectives" in the special victims' unit. In September 2017, one week before her first deposition in this case, plaintiff was informed that she could return to the Seventh District to investigate robberies, but she was not guaranteed "days." Dr. Thapar, however, did not release plaintiff for work, and she did not return.

¶ 29    After March 2018, plaintiff moved to unpaid disability leave, which would expire in December 2022. She testified that if she did not return to work by December 2022, she would no longer be a Chicago police officer. In July of 2022, plaintiff was taking medication for depression and anxiety.

¶ 30                    2. Officer Ternand's Testimony

¶ 31    Officer Ternand, now a sergeant, testified at trial. He stated that he and Officer Caulfield were patrolling on Stewart Avenue when he observed three men sitting on a porch. He could see that one of the men, Lewis, sat on a barstool on top of a firearm. Ternand could see four or five inches of the weapon protruding from under Lewis. Officer Caulfield exited the vehicle and ran to

the porch. When Ternand approached Patrick, Patrick stood and said he would "beat [Ternand's] a\*\* if [he] went up on that porch." Patrick was holding an iPad, and Ternand knocked it out of his hand and grabbed his arm as he attempted to place Patrick into custody. Patrick resisted, and Ternand grabbed Patrick by his hair. Patrick then punched Ternand in the head.

¶ 32 At the police station, Ternand notified plaintiff of the arrests. Before this incident, he had never had a problem working with plaintiff, who had obtained approval for felony gun charges for him in the past. Although he had four conversations with plaintiff after the incident, neither he nor Caulfield told her their version of the events. Plaintiff subsequently told Ternand she would not be seeking approval of their charges. He went to his supervisor, Sergeant Love, to complain about plaintiff. Ternand stated that he talked to other officers about what had happened, and he no longer wanted to work with plaintiff.

¶ 33                                    3. Lieutenant Gutierrez's Testimony

¶ 34 Lieutenant Gutierrez, now a commander, testified that plaintiff had come into his office on May 30, 2016, to inform him that a video recording of the incident contradicted what she had been told by Officers Ternand and Caulfield. He asked plaintiff to produce the video, but he could not recall how she responded. Gutierrez later spoke with plaintiff's supervisors about the charges because he heard that plaintiff called his sergeant, Sergeant Love, a liar. Plaintiff, who was present, denied calling Sergeant Love a liar. Plaintiff was emotional and started crying. Gutierrez denied ordering plaintiff to contact felony review regarding the charges.

¶ 35 After Gutierrez learned that the state's attorney's office rejected the charges against Lewis and Patrick, he told Lieutenant Wodnicki that he was not satisfied with plaintiff's investigation, and he did not want his team to work with her.

¶ 36                                    4. Sergeant Love's Testimony

¶ 37    Sergeant Love testified that on May 30, 2016, she was supervising Officers Ternand and Caulfield. At some point, Ternand told her that plaintiff had called Love a "f*** liar." Love and Gutierrez spoke with plaintiff's supervisors and discussed the arrests of Lewis and Patrick. Plaintiff, who was present, denied calling Love a liar. Love observed that plaintiff was very upset and crying.

¶ 38                                    5. Dennis Walsh's Testimony

¶ 39    Dennis Walsh, a retired Chicago Police captain, testified that Lieutenant Wodnicki was the only person responsible for assigning plaintiff from Area South to the Seventh District. Walsh acknowledged that when plaintiff was placed on the midnight shift, seven detectives with less seniority were assigned to the day shift by management, and 18 detectives with less seniority were assigned to the afternoon shift. When asked whether Lieutenant Wodnicki "ch[ose] or ha[d] a voice in choosing who got picked for third watch," Walsh answered, "Yes, he did."

¶ 40                                    6. Sheila Baxter's Testimony

¶ 41    Baxter testified that she began treating plaintiff in February 2017. Plaintiff had "serious issues" and she was "broken." After several months of treatment, plaintiff had made "no progress." She remained anxious and stressed and was barely functioning. She did not socialize and exhibited "a little bit of paranoia." Plaintiff was eventually referred to a psychiatrist, Dr. Thapar, but she continued to meet with Baxter for therapy sessions.

¶ 42    Dr. Thapar diagnosed plaintiff with major depressive disorder and anxiety. He prescribed medication, and Baxter observed some improvement in plaintiff. After taking medication, plaintiff pushed Baxter to release her for work. Baxter, however, did not believe plaintiff was mentally or emotionally ready to return to work in the police department. When Baxter eventually released her

for work, plaintiff "went way down, even past where she was before." Plaintiff had difficulty accepting that she could "no longer be a part of this police force, this entity, that she loved."

¶ 43                            7. Dr. Thapar's Testimony

¶ 44     Dr. Thapar's testimony was presented via his video-recorded deposition. He stated that, at her first visit, plaintiff exhibited symptoms of depression, including crying spells, low motivation, difficulty sleeping, and appetite changes. He diagnosed her with major depressive disorder and anxiety disorder. Plaintiff had fears of sabotage by other officers. She felt that her life as a detective was "stolen and destroyed," and she would cry at appointments. Dr. Thapar opined that plaintiff's treatment at work was the source of her depression and anxiety. He concluded that she should not return to work because her depressive symptoms would likely increase.

¶ 45                            8. Dr. Landre's Testimony

¶ 46     Dr. Nancy Landre, a neuropsychologist retained by the Chicago Police Disability Fund to evaluate plaintiff, testified that she examined her in April 2018. Plaintiff reported memory issues, binge eating, fear of returning to work, and feelings of sadness. Dr. Landre agreed with Dr. Thapar's diagnosis of major depressive disorder and anxiety disorder. She found plaintiff to be disabled and unable to work as a police officer at that time. Plaintiff's prognosis was "guarded," meaning the likelihood she would return to work as a police officer was "not great." Dr. Landre believed that plaintiff's work as a police officer was causing her distress, which returning to work would only exacerbate.

¶ 47                            9. Dr. Goldstein's Testimony

¶ 48     Diana Goldstein, a neuropsychologist, was retained by the City as an expert. She testified that she conducted an evaluation of plaintiff on March 15, 2019, and April 3, 2019. In doing so, Goldstein reviewed the events that occurred on May 30, 2016. She did not believe that plaintiff

feared for her safety after she became a whistleblower. She further opined that plaintiff was not depressed or disabled. She acknowledged, however, that plaintiff could be suffering from adjustment disorder, a less serious condition than depression.

¶ 49    Goldstein believed that other stressors, such as financial challenges caused by plaintiff's inability to work and her social isolation from police colleagues, caused her symptoms. Goldstein acknowledged that plaintiff took great pride in being a detective and was mourning the loss of that work. She also admitted that a person who has never been treated for mental health issues may not realize for some time that she needs such treatment.

¶ 50                                  10. Joseph Salemme's Testimony

¶ 51    Joseph Salemme testified in rebuttal that he had been a commander at Area South prior to the May 30, 2016, incident. He had found plaintiff's work "outstanding," and she was "professional, hardworking, driven." She also "had that goldmine of successful prosecutions."

¶ 52                                  B. *Jury Instruction Conference*

¶ 53    At the jury instruction conference, the City and plaintiff each proffered a proposed instruction on what conduct constitutes retaliation under the Whistleblower Act. Relevant here, the City's proposed instruction stated:

> "To establish a violation under the Illinois Whistleblower's Act, Plaintiff must prove that she suffered a materially adverse action. When I say materially adverse action, I mean one that well might have dissuaded a reasonable worker in plaintiff's circumstances from making a complaint and which produces a significant injury. A materially adverse action is not a mere inconvenience to the employee or an alteration of an employee's job responsibilities, but rather one that significantly alters the terms and conditions of the employee's job."

Plaintiff objected to this instruction, arguing that it would mislead the jury where the statute did not require the challenged action to be "materially adverse."

¶ 54    After argument by the parties, the trial court rejected the City's proposed instruction. The court did not believe that the jury needed a definition of "retaliation." Rather, the term's meaning

"is in the eye of the jury. The jury's going to hear the facts; they're going to hear what has happened to Detective Svec; they're going to hear what the City did; they're going to determine, based upon the facts and the evidence presented to them, if there was retaliation."

Accordingly, the trial court simply instructed the jury that to prevail on her Whistleblower Act claim, plaintiff must prove that her "employer retaliated against her" for her disclosures and her refusal to participate in actions that would violate a state or federal law, rule, or regulation.

¶ 55                    C. *Jury Verdict and Posttrial Proceedings*

¶ 56    The jury returned a verdict in favor of plaintiff and awarded her a total of $4,350,544.51 in damages. The jury assessed $1,249,144.51 for past and future lost salary, earnings, and benefits; $3 million for emotional distress; and $101,400 for other damages necessary to make plaintiff whole. The trial court entered judgment on the jury's verdict.

¶ 57    The City filed a posttrial motion arguing, in relevant part, that it was entitled to a judgment notwithstanding the verdict (JNOV) because plaintiff failed to present evidence that she suffered a materially adverse action as required by the Whistleblower Act. Alternatively, the City argued that it was entitled to a new trial, where the trial court failed to instruct the jury that a materially adverse action was required to show retaliation. The City also requested a remittitur of the $3 million award for emotional distress, arguing that the amount was excessive, against the manifest

weight of the evidence, and "far outside the flexible limits of fair and reasonable compensation" required for such an award.

¶ 58    The trial court denied the City's motion, finding that "the evidence presented at trial sufficiently favored [plaintiff,] ***" and "the jury's damages awards were reasoned and supported by the evidence." Therefore, "because the case was decided on the facts and law, [it found] no basis for altering the jury's verdict."

¶ 59    The City now appeals.

¶ 60                                    II. ANALYSIS

¶ 61    On appeal, the City contends that the trial court should have granted its motion for a JNOV because retaliation under the Whistleblower Act requires a materially adverse action against the employee and plaintiff's lateral transfer and assignment to a different shift did not constitute materially adverse acts. A JNOV is granted "only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). We review *de novo* the trial court's denial of the City's motion for a JNOV. *Harris v. Thompson*, 2012 IL 112525, ¶ 15.

¶ 62    The following provisions of the Whistleblower Act are relevant in this case:

           "§ 15. Retaliation for certain disclosures prohibited.

           (a) An employer may not retaliate against an employee who discloses information

       in a court, an administrative hearing, or before a legislative commission or committee, or

       in any other proceeding, where the employee has reasonable cause to believe that the

       information discloses a violation of a State or federal law, rule, or regulation.

(b) An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule or regulation.

\* \* \*

§ 20. Retaliation for certain refusals prohibited. An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation, including, but not limited to, violations of the Freedom of Information Act.

\* \* \*

§ 20.1. Other retaliation. Any other act or omission not otherwise specifically set forth in this Act, whether within or without the workplace, also constitutes retaliation by an employer under this Act if the act or omission would be materially adverse to a reasonable employee and is because of the employee disclosing or attempting to disclose public corruption or wrongdoing." 740 ILCS 174/15(b), 20, 20.1 (West 2020).

¶ 63     In construing a statute, a court's primary goal is to ascertain the intent of the legislature. *Land v. Board of Education of Chicago*, 202 Ill. 2d 414, 421 (2002). "The best evidence of legislative intent is the language used in the statute itself, which must be given its plain and ordinary meaning." *Paris v. Feder*, 179 Ill. 2d 173, 177 (1997). Questions of statutory interpretation are reviewed *de novo*. *Land*, 202 Ill. 2d at 421.

¶ 64     Although retaliation is not defined in the Whistleblower Act, the City contends that we should look to how courts have interpreted "retaliation" in other statutes, such as the Illinois Human Rights Act (Human Rights Act) (775 ILCS 5/1-101 *et seq.* (West 2022)), and to federal

cases interpreting the term under the Civil Rights Act of 1964 (Civil Rights Act) (42 U.S.C. § 2000e *et seq.* (2018)). Courts have construed the term in those statutes as taking a materially adverse action against an employee. See *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006); *Hoffelt v. Department of Human Rights*, 367 Ill. App. 3d 628, 635-36 (2006).

¶ 65 In *White*, the plaintiff was the only woman in her department at the respondent's Tennessee Yard. Although she was hired as a "track laborer," she was soon assigned to operate the forklift, which became her primary responsibility. *White*, 548 U.S. at 57. After the plaintiff complained of sexual harassment, her immediate supervisor was disciplined. However, the plaintiff was also removed from forklift duty and assigned to standard truck laborer tasks. *Id.* at 58. She was informed that her reassignment reflected her co-workers' complaints that a " 'more senior man' " should operate the forklift because it was a " 'less arduous and cleaner job' " than that of a truck laborer. (Internal quotation marks omitted.) *Id.*

¶ 66 Shortly after the plaintiff filed discrimination charges with the Equal Employment Opportunity Commission, she had an argument with her immediate supervisor about a work task and was immediately suspended without pay for insubordination. *Id.* An internal investigation later showed that the plaintiff had not been insubordinate, and she was reinstated with backpay for her 37-day suspension. *Id.* at 58-59.

¶ 67 After exhausting her administrative remedies, the plaintiff filed a Title VII complaint against her employer. *Id.* at 59. Therein, she claimed that the change in her job responsibilities, and her 37-day suspension without pay, were unlawful retaliatory acts in violation of Title VII. A jury found in favor of the plaintiff and awarded her compensatory damages. The Sixth Circuit, however, reversed the judgment and found in favor of the respondent on the retaliation claims. *Id.*

¶ 68    The Supreme Court addressed the disagreement among the circuits on whether retaliation under Title VII required the action to be employment-related, and on "how harmful that action must be to constitute retaliation." *Id.* at 60. The Court noted that "[a]n employer can effectively retaliate against an employee by taking actions not directly related to his [or her] employment." *Id.* at 63. Therefore, it held that "the antiretaliation provision *** is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 64. This "broad" interpretation helps to ensure the cooperation necessary to accomplish the statute's primary objectives. *Id.* at 67.

¶ 69    The Court found, however, that the provision does not protect employees from all acts of retaliation. *Id.* at 67. Those who report discriminatory behavior are not immunized from the "petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* at 68. Rather, employees are protected only from retaliation that causes significant injury or harm. See *id.* at 67-68. To prove such harm, one must "show that a reasonable employee would have found the challenged action materially adverse," which means that the action would likely dissuade employees from raising or supporting a discrimination charge. *Id.* Whether an action is materially adverse "depends upon the circumstances of the particular case," from the viewpoint of a reasonable person in the plaintiff's position. *Id.* at 71.

¶ 70    With this definition in mind, the Court affirmed the jury's award to the plaintiff because, "[b]ased on this record, a jury could reasonably conclude that the reassignment of responsibilities would have been materially adverse to a reasonable employee." *Id.* at 71.

¶ 71    To the extent that "materiality" addresses the seriousness of the harm caused by retaliatory conduct, and excludes trivial conduct, we agree with the City that an employee must show that he or she suffered a materially adverse act to recover under the Whistleblower Act. Our legislature did not think of retaliation under the Whistleblower Act as petty slights or minor annoyances that

all employees experience in the workplace. Transcripts from the Illinois House of Representatives' 93rd General Assembly on May 22, 2003, where members debated the retaliation provision in the proposed Whistleblower Act, support this conclusion.

¶ 72    Representative John A. Fritchey described the proposed legislation as addressing "the whistleblower in a private situation. *** [W]hat we're saying is that a boss cannot fire an employee for going to the authorities and saying, something is going on that's a violation of the law." 93d Ill. Gen. Assem., House Proceedings, May 22, 2003, at 85 (statements of Representative Fritchey). Representative Fritchey stated that, at the present time, there was no common law "cause of action for retaliatory discharge *** stemming from going to the authorities to disclose a violation of the law." *Id.* at 92-93. Some members feared that an employee may claim he was "being fired for [whistleblowing] and actually, it might be for incompetence or mishandling of books or destruction of property or all the other things that might be there." See *id.* at 9193rd Ill. Gen. Assem., House Proceedings, May 22, 2003 (statements of Representative Mike Bost). Representative Fritchey, however, assured them that "[t]oday, you can be fired for poor performance as an employee. Under this Bill, you can [be] fired for poor performance as an employee. Today, you can be fired for running to the authorities. With this law in place, you can't do this." *Id.* at 94-95 (statements of Representative Fritchey).

¶ 73    It is apparent from these statements that the legislature primarily viewed retaliation in the whistleblower context as retaliatory discharge. Generally speaking, a retaliatory act affecting an employee's employment, or the terms and conditions of employment, is a materially adverse act under any circumstance.

¶ 74    After the United States Supreme Court decided *White*, our legislature added section 20.1 to the Whistleblower Act. The provision made clear that "*[a]ny other act or omission ****, whether

within or without the workplace, *also* constitutes retaliation *** if the act or omission would be materially adverse to a reasonable employee." (Emphases added.) 740 ILCS 174/20.1 (West 20202). This language closely follows *White*. Therefore, the plain language of section 20.1 indicates an intent to expand the scope of employer conduct constituting retaliation under the Whistleblower Act, beyond the adverse employment-related acts or omissions contemplated when it was first enacted. See *White*, 548 U.S. at 67 (finding that "[t]he scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm"). However, because retaliatory acts or omissions can involve petty or trivial conduct, the conduct must be "materially adverse" to be actionable. See 740 ILCS 174/20.1 (West 2022). In other words, the act or omission must inflict significant, rather than trivial, harm and must "likely *** dissuade" a reasonable employee from disclosing the violation. *White*, 548 U.S. at 70.

¶ 75    *Blisset v. City of Chicago*, 2024 IL App (1st) 230734-U, a case cited by the City as persuasive authority, does not contradict our conclusion. In *Blisset*, the plaintiff failed to present sufficient evidence that he refused to participate in an illegal activity, or that he had a reasonable basis for believing that he was disclosing information that involved a violation of law. He argued that section 20.1 provided an additional basis for recovery, apart from disclosing a violation or refusing to participate in wrongdoing. *Id.* ¶ 32. The court disagreed, finding that section 20.1 did not broaden the scope of protected *employee* activities beyond those set forth in sections 15(b) and 20. *Id.* ¶ 36. Rather, section 20.1 provided "a definition of what conduct constitutes 'retaliation' by an *employer* for purposes of a claim under the [Whistleblower Act]." (Emphasis added.) *Id.*

¶ 76    The parties disagree, of course, on whether the actions in this case constitute materially adverse conduct. Our courts have recognized that, in the context of retaliation, " 'an act that would be immaterial in some situations is material in others.' " *Hoffelt*, 367 Ill. App. 3d at 636 (quoting

*Washington v. Illinois Department of Revenue*, 420 F.3d 658, 661 (7th Cir. 2005)). As such, the materiality of any act of retaliation often depends on the particular circumstances of the case. *Id.* (citing *White*, 548 U.S. at 69).

¶ 77    Here, plaintiff testified that she was transferred to another division after reporting the questionable arrests to her supervisor. She was also removed from investigating unlawful gun possession cases, a position for which she had been specially selected and which gave her great pride. Plaintiff was reassigned to investigate property crimes in a less desirable district.

¶ 78    After the incident, when plaintiff had to bid for shifts for the following year, she selected second watch, the day shift she had worked for many years, as her first choice. She chose "no bid" as her second choice because, by choosing "no bid," she was indicating that she wanted management to exercise its discretion to keep her on second watch. For her third choice, plaintiff selected third watch, or afternoons. Her last choice was the midnight shift. She was assigned the midnight shift.

¶ 79    Plaintiff, who had been a police officer for approximately 20 years, had not worked the midnight shift since she first became an officer. Since 2006, management had utilized its discretion to assign her to a day or afternoon shift. She stated that officers preferred the third watch and that working "days" was "always preferred." It was general knowledge in the police community that officers assigned to the midnight shift were "getting dumped," meaning that the officer's supervisors or management wanted "to set an example."

¶ 80    Furthermore, despite plaintiff having consistently received glowing performance evaluations prior to the incident, with no complaints from fellow officers, no one wanted to work with her after her transfer. Plaintiff's isolation, in a line of work requiring teamwork and cooperation from other officers, certainly affected her ability to perform her job.

¶ 81    The City argues, however, that lateral transfers are not materially adverse actions unless they result in a significant alteration of the employment duties, with a corresponding change in hours, compensation, or career prospects. As support, the City cites numerous federal cases interpreting federal discrimination law, including *Koty v. Du Page County*, 900 F.3d 515 (7th Cir. 2018), *Stutler v. Illinois Department of Corrections*, 263 F.3d 698 (7th Cir. 2001), *Hill v. American General Finance, Inc.*, 218 F.3d 639 (7th Cir. 2000), and *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270 (7th Cir. 1996). These cases, however, are distinguishable.

¶ 82    In *Koty*, the employer presented legitimate reasons for its acts, and, unlike plaintiff in this case, the plaintiff in *Koty* offered no evidence to show a retaliatory motive. *Koty*, 900 F.3d at 520-21. The remaining cases, where the court found that retaliation must consist of adverse acts that materially alter the terms and conditions of employment, were decided prior to *White*. In *White*, the United States Supreme Court determined that retaliation for discrimination is not limited to adverse actions "that affect the terms and conditions of employment" because an employer can retaliate "by taking actions not directly related to [a person's] employment or by causing him harm *outside* the workplace." (Emphasis in original.) *White*, 548 U.S. at 63-64.

¶ 83    Notably, Illinois state courts have interpreted retaliation under an analogous state statute, the Human Rights Act. They recognized that "adverse employment actions based upon claims of undesirable job assignments and lateral transfers" *can* support a charge of retaliation in the right context. *Hoffelt*, 367 Ill. App. 3d at 637. We need not look to other jurisdictions for persuasive authority when Illinois law exists on the point in question. *Allstate Insurance Co. v. Lane*, 345 Ill. App. 3d 547, 552 (2003). The cited federal cases are not persuasive on the issue before us.

¶ 84    Based on the evidence at trial, the jury could have found that the retaliatory acts set forth above would have dissuaded a reasonable worker in plaintiff's position from making disclosures

of a violation of law, or from refusing to participate in the illegal act. The evidence thus supports the jury's determination that plaintiff suffered retaliation under sections 15(b) and 20 of the Whistleblower Act. Accordingly, the trial court properly denied the City's motion for a JNOV where the evidence, viewed in the light most favorable to plaintiff, did not so overwhelmingly favor the City that no contrary verdict based on the evidence could ever stand. See *Pedrick*, 37 Ill. 2d at 510.

¶ 85    Alternatively, the City contends that a new trial is warranted where the trial court denied its proffered jury instruction on retaliation and refused to give the jury a definition of retaliation under the Whistleblower Act. The City argues that, as a result, the court failed to convey to the jury the applicable law on the meaning of retaliation. Plaintiff responds that the City forfeited review of this issue where it did not propose the exact instruction it now claims should have been given the jury. See *Mikolajczyk v. Ford Motor Co.*, 231 Ill. 2d 516, 557-58 (2008) (finding that "[a] party forfeits the right to challenge a jury instruction that was given at trial unless it makes a timely and specific objection to the instruction and tenders an alternative, remedial instruction to the trial court").

¶ 86    We agree with plaintiff. The City contends on appeal that the trial court should have instructed the jury that to recover for retaliation, plaintiff must show she suffered a materially adverse action. It also argues that the court should have defined "materially adverse" action as action that "might have dissuaded a reasonable worker in plaintiff's circumstances from making a complaint and which produces a significant injury." However, at the jury instruction conference, the City proposed a different instruction. The City's proffered instruction stated that a "materially adverse action" not only dissuades a reasonable worker from making a complaint, but it also "significantly alters the terms and conditions of the employee's job." The City never tendered a

remedial instruction, the one it now supports on appeal, to the trial court. Therefore, the issue is forfeited for review.

¶ 87    Nonetheless, even if the trial court's instruction was error, reversal is not warranted unless the error resulted in "serious prejudice" to the City's right to a fair trial. *Studt v. Sherman Health Systems*, 2011 IL 108182, ¶ 28. The City contends that it was severely prejudiced by the alleged error because the lack of instruction "lower[ed] the threshold for what constitutes a violation of the [Whistleblower Act]" and could have "permitted the jury to find for [plaintiff] without deciding whether she suffered a materially adverse action." The City argues that the jury could have found it liable for retaliation based on the petty slights or annoyances found in every workplace.

¶ 88    The jury, however, could not have found the City liable for retaliation based on petty slights or minor annoyances. As we have found, plaintiff's retaliation claim was based on job-related acts that were materially adverse. Therefore, the City was not prejudiced by the trial court's failure to provide the jury with a definition for "materially adverse" action.

¶ 89    The City's final contention is that the trial court erred in denying its motion requesting remittitur of the $3 million award for emotional distress. The City argues that the amount was excessive, against the manifest weight of the evidence, and "far outside the flexible limits of fair and reasonable compensation" for such an award.

¶ 90    The purpose of a remittitur is to correct an excessive jury verdict under limited and appropriate circumstances. *Estate of Oglesby v. Berg*, 408 Ill. App. 3d 655, 661 (2011). Since the determination of damages is a function reserved for the jury, we will not lightly substitute our judgment for that of the jury on this issue. *Kindernay v. Hillsboro Area Hospital*, 366 Ill. App. 3d 559, 572 (2006).

"A verdict will not be set aside by a court unless it is so excessive that it indicates that the jury was moved by passion or prejudice or unless it exceeds the necessarily flexible limits of fair and reasonable compensation or is so large that it shocks the judicial conscience." *Id.*

¶ 91    A remittitur is plaintiff's agreement to remit to defendant that portion of the damages that is excessive, and to accept the sum the court has determined is properly recoverable. *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 253 (2006). The trial court has no authority to reduce the damages by entry of a remittitur if plaintiff objects. *Id.* Therefore, the trial court must afford plaintiff the opportunity to agree to, or refuse, the entry of a remittitur. *Id.* at 253-54. If plaintiff refuses the entry of a remittitur, the court will order a new trial on damages. *Id.* at 254. We review the trial court's ruling on a motion for a remittitur for abuse of discretion. *Oglesby*, 408 Ill. App. 3d at 661 (2011).

¶ 92    Plaintiff's claim for emotional distress damages is based on (1) the humiliation, shame, and despair she experienced due to the conduct of her supervisors and other officers after she refused to support the arrests made by Officers Ternand and Caulfield, and (2) the loss of her career with the Chicago Police Department.

¶ 93    The evidence at trial showed that plaintiff first experienced distress on May 30, 2016, the day she began to investigate the arrests made by Officers Ternand and Caulfield. When her investigation revealed inconsistencies in the officers' account of the arrest, plaintiff realized that she had to confront the officers with their lies regarding the incident. Telling the truth would "hurt" her because she was not "protecting the officers."

¶ 94    There is also substantial evidence of the distress plaintiff suffered when she informed her supervisor, and the officers' supervisor, of her findings, and they chose not to support her. Instead,

she was transferred to another district to investigate property crimes, and she was assigned the midnight shift. Plaintiff testified that officers on the midnight shift were "getting dumped" by management and working days was preferred. Plaintiff acknowledged, however, that she did not have the seniority to get those preferred shifts through the bidding process. She testified that since 2006, management had utilized its discretion to assign her to a day or afternoon shift.

¶ 95    In November 2016, plaintiff participated in the bidding process for the following year and requested second watch as her first choice and no bid as her second choice. She was again assigned the midnight shift.

¶ 96    Plaintiff continued to work at her new assignment, without evidence of distress, until December 2016, when she fell at home and sustained an injury. She was placed on medical leave until April 2017. During this time, as she discussed returning to work, she feared facing alienation from her fellow officers and shame from their judgment of her. In particular, she felt that "being put on midnights *** was one of the worst things that they could have done." Plaintiff was referred to a mental health counselor.

¶ 97    Despite her fears, plaintiff "begged" to return to work in March and April of 2017. She returned to her midnight shift assignment and was informed of requests to test her urine. She also heard that "everybody's p**sed at you," and they called her a "whistleblower" and "crazy." Plaintiff began smoking again because it was "a stress reliever." She could not sleep for days and gained weight from binge eating. She withdrew from relationships and felt fear, anxiety, and embarrassment. In July 2017, plaintiff returned to medical leave and began treatment with Dr. Thapar, who diagnosed her with major depression and anxiety.

¶ 98    During this leave, plaintiff submitted numerous requests to be assigned to robberies, her preferred subject, and second watch upon her return. In August 2017, plaintiff was offered second

watch in the special victims' unit, where workers were needed, but she declined because she wanted to investigate robberies. In September 2017, plaintiff was informed that she could go to the Seventh District to investigate robberies, although she was not guaranteed "days." Plaintiff, however, was not released for work and did not return. Since she was unable to return by December 2022, she could no longer be a Chicago police officer.

¶ 99    While this evidence clearly supports damages for the emotional distress plaintiff suffered from her treatment by her supervisor and certain officers, it offers much less support for emotional distress damages resulting from the loss of her career. Plaintiff was never terminated, nor did her pay decrease, and she continued to work for about five months after her initial transfer without evidence of distress. Even while she was on leave starting July 2017, due to the distress she experienced when she returned to work in April, plaintiff always expressed a desire to continue work with the Chicago Police Department.

¶ 100   In fact, plaintiff actively pursued such opportunities during that second leave. She made a number of requests to investigate robberies on second watch. She was offered second watch with another unit, which she declined because she wanted to investigate robberies. She was then offered an assignment to investigate robberies, but with no guarantee she would be working the day shift. Plaintiff testified that she greatly preferred an assignment to second watch. However, she acknowledged that she lacked the seniority to be assigned to second watch through the bidding procedure. This offer gave plaintiff what she was entitled to, based on her request and her seniority.

¶ 101   While plaintiff may have faced the same treatment with this assignment that she suffered when she returned to work in 2017, we cannot say from the evidence that she would have necessarily experienced the same level of distress. Working in her preferred area of investigating robberies, during a shift other than the midnight shift, may have given her enough satisfaction to

withstand the behavior of some of the officers and continue working. The evidence supports this conclusion where plaintiff initiated contact with the department to request an assignment while on leave, and she expressed her desire to return to investigate robberies on the day shift, despite the distress she experienced from prior adverse treatment. Plaintiff never had a chance to work that assignment, though, so there is no evidence of her distress while working that particular job. Accordingly, there is no evidence to support that she lost her preferred career as a Chicago police officer due to distress from retaliatory conduct.

¶ 102  Given this lack of evidence, we find that the $3 million damages award for emotional distress requires remittitur because it is excessive so as to shock the judicial conscience. However, as we discussed, there is ample evidence of plaintiff's distress based on the retaliatory conduct of her supervisor and other officers when she refused to support the arrests made by Officers Ternand and Caulfield.

¶ 103  Therefore, we remit the $3 million award to $1.5 million, which is in line with emotional distress damages awarded in a majority of the whistleblower cases cited by plaintiff in her brief or as supplemental authority, including Kubiak v. City of Chicago, No. 2015-L-005251 (Cir. Ct. Cook County) ($1.5 million), *Bailets v. Pennsylvania Turnpike Comm'n*, 181 A.3d 324 (Pa. 2018) ($1.6 million), *Eller v. Idaho State Police*, 443 P.3d 161 (Idaho 2019) ($1.5 million), *Hoeper v. Herrera*, CGC-15-543553 (Sup. Ct. Cal. 2017) ($1.3 million), *Wascher v. Southern California Permanente Medical Group*, G047042 (Sup. Ct. Cal. 2015) ($1.75 million), *Ivie v. AstraZeneca Pharmaceuticals, LP*, 3:19-CV-01657-HZ ($1.87 million), and *Davis v. City of Chicago*, 2024 IL App (1st) 221888-U ($1.1 million). See Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) (giving this court authority to grant any relief that the case may require, including the entry of a remittitur). If plaintiff does not consent to entry of the remittitur within 21 days of the filing of this

order, or any further period in which the mandate is stayed, this matter will be remanded to the circuit court for a new trial on the issue of emotional distress damages only. See *Richardson v. Chapman*, 175 Ill. 2d 98, 120 (1997).

¶ 104                                    III. CONCLUSION

¶ 105   For the foregoing reasons, the judgment of the trial court is affirmed, but damages for emotional distress is reduced to $1.5 million. If plaintiff does not consent to the remittitur, the cause will be remanded to the trial court.

¶ 106   Affirmed as modified.

¶ 107   PRESIDING JUSTICE REYES, concurring in part and dissenting in part:

¶ 108   Although I concur in the remainder of the majority opinion, I disagree with the decision to remit the $3 million award for emotional distress to $1.5 million, as I do not believe that the award was excessive, shocking, or motivated by jury passion or prejudice.

¶ 109   The jury had the opportunity to observe plaintiff and multiple mental health professionals as they testified regarding the physical and emotional impact of the City's retaliatory conduct and the resultant loss of status and stability for plaintiff. Based on this evidence, the jury determined that $3 million was an appropriate amount to award for her emotional distress. This calculation was necessarily based on its own independent assessment, given that plaintiff's counsel did not suggest a specific amount to the jury. As the trier of fact determines the amount of damages, we must give great deference to the jury's award. *Estate of Oglesby v. Berg*, 408 Ill. App. 3d 655, 661-62 (2011). The trial court then denied the City's request to limit the jury's award of damages through remittitur. We review the trial court's ruling on a remittitur motion under an abuse of discretion standard. *Id.* at 661.

¶ 110   The purpose of remittitur is "to correct an excessive jury verdict in limited and appropriate

circumstances," *i.e.*, when the award "is so excessive that it indicates that the jury was moved by passion or prejudice" or "it exceeds the necessarily flexible limits of fair and reasonable compensation or is so large that it shocks the judicial conscience." (Internal quotation marks omitted.) *Id.* at 661-62. While the majority speculates that the exact parameters of plaintiff's emotional distress may not warrant the $3 million award (*supra* ¶¶ 101-02), this court has recognized that a damage award is not subject to "scientific computation." (*Oglesby*, 408 Ill. App. 3d at 663). Furthermore, plaintiff has cited multiple cases from Illinois and other jurisdictions in which a whistleblower was awarded a seven-figure damage amount for emotional distress. Contrary to the majority, I do not interpret those cases wherein less than $3 million was awarded (*supra* ¶ 103) as a justification for the reduction of the jury's award or the rejection of the trial court's remittitur ruling. Even if I found remittitur to be appropriate—which I do not—the majority's adoption of a 50% reduction appears to be arbitrary and unsupported.

¶ 111    For the foregoing reasons, I respectfully dissent from the portion of the majority's opinion relating to remittitur.

*Svec v. City of Chicago*, 2024 IL App (1st) 230893

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 20-L-010535; the Hon. Daniel J. Kubasiak, Judge, presiding. |
| **Attorneys for Appellant:** | Mary B. Richardson-Lowry, Corporation Counsel, of Chicago (Myriam Zreczny Kasper, Suzanne M. Loose, and Alexandra Weiss, Assistant Corporation Counsel, of counsel), for appellant. |
| **Attorneys for Appellee:** | Torreya L. Hamilton, of Hamilton Law Office, LLC, and Thomas P. Needham, both of Chicago, for appellee. |